In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 20-2163

BOBBIE JO SCHOLZ,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA, *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 19-cv-01074 — **William C. Griesbach**, *Judge.*

---

ARGUED SEPTEMBER 22, 2021 — DECIDED NOVEMBER 23, 2021

---

Before SYKES, *Chief Judge*, and FLAUM and BRENNAN, *Circuit Judges*.

FLAUM, *Circuit Judge*. Plaintiff-appellant Bobbie Jo Scholz suffered from serious physical and mental ailments following her service in the military. As a result, Scholz received extensive treatment from the Department of Veterans Affairs ("VA"). After this challenging medical journey, she pointed to government negligence as the cause of the drastic decline in her mental and physical state. Seeking recourse, Scholz sued

defendant-appellee United States twice under the Federal Tort Claims Act ("FTCA"), 28 U.S.C §§ 1346(b), 2671–2680. Her first lawsuit predominately failed at the motion-for-summary-judgment stage. Her second lawsuit, now before us on appeal, sought to raise claims implicating the same, or essentially the same, facts as those claims from her first lawsuit. The district court therefore dismissed her duplicative lawsuit under the rule against claim splitting. Agreeing with the district court, we now affirm.

## I. Background

Scholz was honorably discharged following her 2006 to 2008 tour of duty in Iraq for the United States Army, but the mental and physical toll of her service unfortunately extended well beyond her time in the military. In the years that followed, Scholz required a range of medical treatment. As the relevant starting point for this appeal, Scholz sought two courses of inpatient mental health treatment at the VA Medical Center in Tomah, Wisconsin (the "Tomah VAMC") between January and March 2011. Later, while receiving outpatient mental health treatment through the Tomah VAMC, she met with surgeons at the Zablocki VA Medical Center in Milwaukee, Wisconsin (the "Zablocki VAMC") about an elective breast reduction surgery in mid-December 2011. That same month, an unrelated psychological assessment performed at the Zablocki VAMC raised red flags about Scholz's mental health. Surgeons at the Zablocki VAMC performed the elective breast reduction surgery in January 2012, which ignited a cascade of complications—surgical and otherwise. Scholz continued to receive outpatient mental health treatment, including prescription medications, from various VA providers through the fall of 2018.

Scholz currently has two active lawsuits pending against defendant. The first lawsuit, *Scholz v. United States*, No. 16-cv-01052, 2021 WL 3465953 (E.D. Wis. Aug. 6, 2021) ("*Scholz I*"), began when Scholz sued defendant on August 8, 2016, in the Milwaukee division of the Eastern District of Wisconsin. The second, lawsuit—and the one currently before us—*Scholz v. United States*, No. 19-cv-01074 (E.D. Wis. dismissed June 8, 2020) ("*Scholz II*"), began when Scholz sued defendant on July 26, 2019, in the Green Bay division of the Eastern District of Wisconsin.

Both lawsuits concern the treatment Scholz received at various VA facilities and outpatient programs. The extent to which the lawsuits cover the same conduct, however, is the key question presented in this appeal. The government argues that *Scholz I* and *Scholz II* rely on the same, or essentially the same, operative facts, which would preclude *Scholz II* on claim-splitting grounds. Scholz, on the other hand, argues that *Scholz I* and *Scholz II* turn on different sets of operative facts such that claim splitting is inapplicable. To analyze this dispute, we summarize the relevant details of each lawsuit below.

### A. *Scholz I*[1]

In line with the FTCA's administrative exhaustion requirements, 28 U.S.C. § 2675(a), Scholz first submitted a form SF-95 claim for damage, injury, or death to the Milwaukee VA on September 9, 2013. Her 2013 administrative claim focused on her breast reduction surgery and resultant "severe physical

---

[1] The district court took judicial notice of the *Scholz I* record. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1080-81 (7th Cir. 1997); *Doherty v. City of Chicago*, 75 F.3d 318, 324 n.4 (7th Cir. 1996).

disfigurement and permanent physical, mental and emo-
tional disabilities." In this initial step of administrative re-
view, she alleged that her physician team at the Zablocki
VAMC "failed to obtain proper informed consent prior to [her
breast reduction] surgery and this failure was a cause of in-
jury as [she] would not have undergone the surgery had she
been properly informed." She alleged this initial negligent ac-
tion resulted in "on-going treatment and additional … painful
surgeries … which have impacted her physical, mental and
emotional health."

Scholz's September 2013 administrative claims were de-
nied on April 2, 2014. Relevant to this appeal, the denial letter
apprised dissatisfied claimants of available paths for recon-
sideration, including the option to file a federal lawsuit within
six months of the denial, but qualified this guidance with the
following caveat:

> Please note that FTCA claims are governed by a
> combination of Federal and state laws. Some
> state laws may limit or bar a claim or law suit.
> VA attorneys handling FTCA claims work for
> the Federal government, and cannot provide
> advice regarding the impact of state laws or
> state filing requirements.

On September 26, 2014, Scholz filed a request for reconsid-
eration with the VA General Counsel. In its October 14, 2014,
acknowledgment of receipt of Scholz's request for reconsider-
ation, the VA once again warned Scholz about the combina-
tion of state and federal law governing FTCA claims, provid-
ing the same caveat listed above that appeared in the April 2,
2014, denial.

Scholz filed another form SF-95 on March 7, 2015, adding allegations of negligent mental health treatment at the Tomah VAMC "[c]ommencing on or about January 1, 2011, and continuing thereafter for years" claiming "[s]he was placed in a dangerous situation through improper prescriptions of medications" and "was unable to properly care for herself resulting in permanent mental, emotional and physical injury." In denying this request on September 8, 2015, regional counsel included information about filing a request for reconsideration with the VA General Counsel and the option for filing suit in federal district court, but it did not include the twice-received disclaimer regarding the impact of state laws and state filing requirements on filing a suit in federal court. On October 3, 2015, Scholz filed a request for reconsideration with the VA General Counsel. In its October 15, 2015, acknowledgment of receipt of request for reconsideration, the VA again mirrored the previous disclaimer that "[s]ome state laws may limit or bar a claim or law suit" relating to FTCA claims and "VA attorneys handling FTCA claims work for the Federal government, and cannot provide advice regarding the impact of state laws or state filing requirements."

On February 18, 2016, the VA issued a final decision upon reconsideration, denying both Scholz's 2013 claim relating to her breast reduction surgery and her 2015 claim relating to her mental health treatment in a joint decision. This denial stated:

> This denial is the last action we will take on this tort claim. If your client wishes to pursue this claim further, she may file suit in Federal district court within 6 months from the date at the top of this letter.

…

> Please note that FTCA claims are governed by a combination of Federal and state laws. Some state laws may limit or bar a claim or law suit. VA attorneys handling FTCA claims work for the Federal government, and cannot provide advice regarding the impact of state laws or state filing requirements.

Thereafter, Scholz filed *Scholz I*—a two-count complaint based on her 2013 and 2015 administrative claims—in federal district court on August 8, 2016. The complaint implicated concerns about both Scholz's mental health treatment and her breast reduction surgery. Scholz's complaint alleged that after her tour of service, she was treated for various mental health issues at the Tomah VAMC in 2011 and 2012 and had been prescribed as many as sixteen active medications during that time. As detailed in the complaint, on January 6, 2012, around the time of Scholz's Tomah VAMC treatment, a medical team at Zablocki VAMC performed a bilateral breast reduction surgery on Scholz. With respect to that procedure, Scholz alleged the operating surgeons failed to obtain informed consent, despite her "diminished mental status." After the surgery, several distressing post-operative complications arose, which required four additional corrective surgeries over two years. Of note, the Zablocki VAMC surgeons flagged "self mutilation" as a contributing factor.

At a high level, the two counts asserted claims of "negligence and professional malpractice in connection with medical care provided to Plaintiff Scholz by the Department of Veteran Affairs at the Tomah Veterans Affairs Medical Center, the Zablocki Veterans Affairs Medical Center, and outpatient

programs." Framed by Scholz as part of her medical negligence claim, the complaint also briefly alleged that the VA was negligent in failing to timely provide her records from the Tomah VAMC, despite her formal requests for them.[2]

The district court began by dismissing Scholz's claim of negligent hiring, supervision, or retention because she had failed to exhaust administrative remedies for any such claim, which the FTCA requires. 28 U.S.C. § 2675. Separately, the district court found Scholz was not alleging a standalone tort based on an alleged duty to provide medical records, but instead "offer[ed] these details only in support of her medical malpractice claim." Next, the district court denied as untimely Scholz's motion to amend her complaint to increase her requested damages from $2.5 million to $4 million because Scholz had not provided good cause for the delay.

After the close of discovery, both parties then filed motions for summary judgment. As relevant to this appeal, the United States moved for partial summary judgment on Scholz's claim of medical malpractice involving the 2011 treatment she received from providers at the Tomah VAMC, arguing the claim was time-barred. Scholz countered that her

---

[2] The *Scholz I* complaint states that the defendant "had a duty to provide patient treatment records and notice of deficiencies in patient care at the Tomah VAMC to all other treatment facilities and to patients" and "breached its duty by negligently failing to ensure that patient treatment records and deficiencies in care were timely communicated to all VAMC health care providers and to [Scholz]." When pressed on this, Scholz clarified the "claim is that her medical records and unstable mental condition [were] not provided to other VA healthcare providers and VA facilities that were treating her and resulted in injury. This lack of continuity of care is part of [Scholz's] medical negligence claim."

claims encompassed her ongoing outpatient treatment, as well. Scholz's response relied on a "continuous treatment doctrine"—essentially, Scholz argued defendant's wrongful conduct was ongoing—to support her claim the statute of limitations had not run.

To support her continuous treatment theory, Scholz offered declarations from her two proffered experts, Dr. Lawrence Amsel and Dr. Jill Johnson. Dr. Amsel explained his opinion that "[d]uring the years 2011 through 2018 [Scholz's psychiatrist] Dr. Dy continued prescribing medications that had been negligently prescribed at the Tomah VAMC" and "Dr. Dy admitted that on 25 different occasions during the years 2011 to 2018 he received pharmacy warnings about the unsafe medication combinations he was prescribing but continuously ignored the warnings and ordered them for" Scholz. Summarizing the "entire record in this case," Dr. Amsel saw "evidence of on-going continuous negligent mental health treatment practices affecting the Plaintiff's treatment during the years 2011 through the present at the Tomah VAMC, Zablocki VAMC, and VA outpatient clinics." Dr. Johnson similarly opined that "the pharmaceutical treatment rendered to the Plaintiff by the Department of Veterans Affairs commencing during Plaintiff's treatment at the Tomah VAMC, and continuing in the Zablocki VAMC and outpatient clinics during the years 2011 through 2017 … failed to meet the required standard of care of reasonable health care providers and was a cause of injury to" Scholz. In short, Scholz's experts made the case that the government's tortious conduct continued well past 2011 and into 2017 or 2018.

Separate from the government's motion, Scholz filed a motion for summary judgment of her own for, among other

claims, her claim that she "was deprived of her basic right to informed consent for her mental health treatment." Echoing the declarations of Dr. Amsel and Dr. Johnson, she again contended in this motion that there were "years of continuing mental health treatment at the VA" and that the government's wrongdoing occurred both during her time at the Tomah VAMC and Zablocki VAMC but also "in her subsequent outpatient treatment."

Considering these motions, as well as the expert witness proffers, the district court granted the government's motion, denied Scholz's motion, and largely prohibited Scholz from introducing her expert's declarations and testimony because their opinions were not timely disclosed. The court held that Scholz's claims of negligent mental health treatment at the Tomah VAMC were barred by Wisconsin's statute of limitations and statute of repose, rejecting as insufficiently supported Scholz's argument about a course of continuing negligent treatment. The court also denied Scholz's motion for summary judgment. Reflecting later, the court said "[t]his phase did not go well for the plaintiff, largely because of errors made by her attorney."

The district court denied Scholz's subsequent motion for reconsideration, underscoring the impropriety of introducing new evidence, rehashing previously rejected arguments, or developing arguments for the first time at this stage of litigation. The district court rejected any attempt by Scholz to assert an estoppel argument at this stage as forfeited for failure to present in her initial response to the government's motion for summary judgment. The district court also denied Scholz's motions throughout litigation for sanctions against the

government for violating discovery rules, engaging in misconduct, and spoliation of evidence.

After much of this pre-trial litigation, the district court judge recused himself. Scholz's remaining claims were tried at a bench trial in March 2021. At trial, the court considered evidence concerning Scholz's mental health treatment provided by the VA, including the testimony of Dr. Amsel, Dr. Johnson, and the pharmacy records over those years. The court commented that "plaintiff's counsel pa[id] some attention to all aspects of Scholz's treatment, but [did] not pay[] meaningful attention to … the more meritorious components of her complaint," which "resulted in an evidentiary shortfall regarding meaningful aspects of Scholz's claims." Nevertheless, the court found negligence causing injury in a narrow aspect of Scholz's VA treatment—the failure to coordinate mental health care at and after the time she underwent a procedure to address a traumatic post-operative complication. Finding that Scholz only met her burden of proof to this limited extent, the court awarded $200,000 for pain, suffering, and mental anguish. Final judgment in this matter is pending for review of Scholz's request for all applicable costs and fees pursuant to Federal Rule of Civil Procedure 54(d).

### B.  Scholz II

Shortly after the *Scholz I* district court denied Scholz's motion to reconsider its summary judgment ruling, Scholz started the administrative process anew by again filing SF-95 forms with the Milwaukee VA on July 11, 2019, and July 17, 2019. The administrative filing included claims related to Scholz's informed consent, mental health treatment, and prescribed medications, along with claims alleging negligent production of records and misleading representations made

by VA legal counsel on September 8, 2015, and October 15, 2015, that impacted the timeliness of Scholz's first federal court suit.[3] Notably, the June 17, 2019, filing relies upon and attaches the declarations of Dr. Amsel and Dr. Johnson submitted to and rejected by the *Scholz I* court.

Around two months after the *Scholz I* district court's summary judgment ruling, Scholz filed *Scholz II*—another case in federal district court against the United States (and the Secretary of Health and Human Services). She subsequently filed an amended complaint that attached the administrative claims Scholz had filed on June 17 and July 11, 2019. This complaint contained six counts: medical negligence (Count I); pharmacy and oversight negligence (Count II); negligent failure to obtain informed consent (Count III); negligent failure to maintain and release accurate and complete medical records (Count IV); negligent hiring, training, supervision, and retention (Count V); and VA misrepresentations (Count VI).

As to Counts I and II, Scholz argued that the "continuing" and "on-going" outpatient mental health treatment she received from the VA between "2011 through August 2018" was negligent. Specifically, she alleged "Defendant breached its duty of care and provided negligent mental health psychiatric treatment to the Plaintiff after her discharge from the Tomah VAMC in 2011 and continuing until she ceased psychiatric

---

[3] Looking to the *Scholz I* administrative proceedings, the September 8, 2015, correspondence did not include a disclaimer that FTCA claims were governed by a combination of federal and state laws and VA attorneys could not provide state-specific advice, but the October 15, 2015, and February 18, 2016, correspondences did include such a disclaimer. This disclaimer specifically noted that "[s]ome state laws may limit or bar a claim or law suit."

treatment from the Department of Veterans Affairs in 2018." She also alleged that "Defendant's failure to provide pharmacy and related oversight" caused her to "receive[] on-going harmful medications and combinations of medications from the Zablocki VAMC outpatient providers on a continuing basis during the period 2011 through August 2018." As to Count III, Scholz argued that she never gave informed consent for the mental health treatment "during the years 2011 through 2018." Count V also realleged essentially the same claim under a negligent supervision theory.

As to Count IV, Scholz alleged that the government had violated various discovery rules related to the maintenance and timely disclosure of records in response to Scholz's requests "during the period of 2013 through 2018." Along these same lines, Count V alleged that defendant had "negligently breached its duty as to hiring, training, supervision and retention of employees necessary to provide Plaintiff with timely[,] accurate and complete copies of her medical records in response to Plaintiff's on-going requests during the period 2013 through 2018." For example, she explains on appeal, she was not given outpatient pharmacy records from 2011 to 2018 until two days before *Scholz I* discovery closed. She claimed as damages for these counts the deprivation of "her legal right to bring timely administrative claims and successfully pursue legal actions and remedies for negligent conduct of VA employees and agents," the incursion of "substantial litigation costs and litigation related services of attorneys and others," and the deprivation of "legal remedies based upon the statute of limitations."

As to Count VI, Scholz alleged that the VA had made various "misrepresentations" during the pre-suit administrative

process that caused Scholz to "los[e] her right to pursue [a] federal court remedy for negligent treatment at the Tomah VAMC." Specifically, she alleged that VA representatives told her on February 18, 2016, that she had 6 months to file a lawsuit but that after she filed *Scholz I* on August 8, 2016, the district court granted the government partial summary judgment on Scholz's tort claims arising from Tomah VAMC treatment because the claims were time-barred by Wisconsin's statute of limitations.

Attacking the similarities between *Scholz I* and *Scholz II*, the government moved to dismiss Scholz's amended complaint under Federal Rule of Civil Procedure 12(b)(6) on the grounds that it violated the rule against claim splitting. The district court agreed, granted the motion, and entered judgment for the government on June 8, 2020. This appeal of the district court's dismissal followed.

## II. Discussion

This case presents a host of issues, many of which overlap. We look first at the jurisdictional question presented by the government. We next discuss claim splitting, the focus of the district court's appealed decision. Relevant to claim splitting, we address the appropriate standard of review, compare the factual underpinnings of *Scholz I* and *Scholz II*, and engage with Scholz's many counterarguments. We ultimately affirm the district court's dismissal of Scholz's case.

### A. Jurisdiction

The government briefly argues that this Court, as well as the district court, lacked subject matter jurisdiction. "[I]n the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Brownback v. King*, 141 S. Ct. 740,

749 (2021). In short, the government argues that because "Scholz's allegations do not give rise to viable claims for relief under the Federal Tort Claims Act," subject matter jurisdiction is deficient.

To decide jurisdiction, we would need to first examine whether Scholz has presented a viable claim under the FTCA, the underlying merits question. *See id.* ("'[M]erits and jurisdiction will sometimes come intertwined,' and a court can decide 'all … of the merits issues' in resolving a jurisdictional question, or vice versa." (some alterations in original) (citation omitted)). Although "[s]ubject matter jurisdiction is ordinarily a threshold issue," the FTCA introduces "an often fact-intensive inquiry" that is no different than the merits inquiry. *Zigler v. United States*, 954 F.2d 430, 432 (7th Cir. 1992). Therefore, "[w]e see no reason why we necessarily must determine [subject matter jurisdiction] first, or at all, if another issue is dispositive." *Id.*

## B. Claim Splitting

### 1. *Relevant Standard of Review*

Before we can reach the claim-splitting question, we must resolve a dispute about the applicable standard of review. Framing the main issue in this case as one of claim preclusion, also known as res judicata, Scholz argues that we are bound to review the district court's motion-to-dismiss decision de novo. *See Bell v. Taylor*, 827 F.3d 699, 706 (7th Cir. 2016) ("We review de novo a dismissal based on res judicata."). Instead framing the main issue as one of claim splitting or of dismissal of duplicative litigation, the United States argues we must review only for abuse of discretion. As the United States points out,

> In dealing with simultaneous actions on related theories, courts at times express principles of "claim splitting" that are similar to claim preclusion, but that do not require a prior judgment. A dismissal on this ground has been viewed as a matter of docket management, reviewed for abuse of discretion, even in decisions that with some exaggeration describe the theory "as an aspect of res judicata."

*See* 18 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 4406 (3d ed.); *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 34 (2012) (Alito, J., dissenting) ("Plaintiffs generally must bring all claims arising out of a common set of facts in a single lawsuit, and federal district courts have discretion to enforce that requirement as necessary 'to avoid duplicative litigation.'" (citation omitted)).

Our Court has also recognized that a district court has "significant latitude" and "broad discretion to dismiss a complaint 'for reasons of wise judicial administration ... whenever it is duplicative of a parallel action already pending in another federal court.'" *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 888–89 (7th Cir. 2012) (some internal quotation marks omitted) (quoting *Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223 (7th Cir. 1993)). We review such decisions for an abuse of discretion. *See id.* at 889; *Serlin*, 3 F.3d at 223.

To determine the appropriate standard of review, we must examine whether the district court couched its decision in claim splitting or claim preclusion. The motion to dismiss filed by the government principally asserted that *Scholz II* "duplicates" *Scholz I*, and therefore "violates the rule against claim splitting." Considering this motion, the district court

likewise framed the issue as whether *Scholz II* "should be dismissed because it violates the rule against claim splitting." The court's "determin[ation] that the entirety of [Scholz's] complaint is barred by the rule against claim splitting" makes it abundantly clear, then, that the district court reached a claim-splitting, not a claim-preclusion, decision. Thus, appeal from that order calls for us to review only for an abuse of discretion. *See McReynolds*, 694 F.3d at 888–89; *Serlin*, 3 F.3d at 223.

To be sure, both the defendant's motion to dismiss and the district court's eventual dismissal referenced claim preclusion. These references, however, were necessary because, as the district court noted, "claim splitting draws on the law of claim preclusion when determining whether the second lawsuit should be dismissed." Indeed, the district court correctly observed that "the doctrine of claim splitting is related to, but distinct from, the doctrine of claim preclusion." *See Roumann Consulting Inc. v. Symbiont Constr., Inc.*, No. 18-C-1551, 2019 WL 3501527, at *6 (E.D. Wis. Aug. 1, 2019) (citing *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000)). Therefore, the references to and reliance on caselaw concerning claim preclusion did not transform the district court's decision to grant defendant's motion to dismiss on claim-splitting grounds into a decision based on claim preclusion.

### 2. *Claim Splitting Examined*

Turning to the primary question on appeal, this Court must assess whether the district court abused its discretion in determining that *Scholz II* is duplicative of *Scholz I* such that the rule against claim splitting prohibits *Scholz II*. We have held that "[a] suit is duplicative if the 'claims, parties, and available relief do not significantly differ between the two

actions.'" *McReynolds*, 694 F.3d at 889 (quoting *Ridge Gold Standard Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 572 F. Supp. 1210, 1213 (N.D. Ill. 1983)). When a plaintiff brings such "a suit, arising from the same transaction or events underlying a previous suit, simply by a change of legal theory," claim splitting has occurred, and the suit cannot be maintained. *Carr v. Tillery*, 591 F.3d 909, 913 (7th Cir. 2010); *see also Bell*, 827 F.3d at 707 ("[Plaintiff] cannot use a second lawsuit against [defendant] to take another bite at the apple.").

We have further explained that "claim splitting in duplicative lawsuits" is a subset of the res judicata doctrine. *Palka v. City of Chicago*, 662 F.3d 428, 437 (7th Cir. 2011); *Rexing Quality Eggs v. Rembrandt Enters., Inc.*, 953 F.3d 998, 1002 (7th Cir. 2020) ("[T]he law on claim-splitting is part of the law of res judicata."); *Carr*, 591 F.3d at 914 (noting that claim splitting "is barred by the doctrine of res judicata").

Thus, to determine whether the district court correctly dismissed this case on claim-splitting grounds, we must draw on principles of claim preclusion, although continuing to appreciate the differences between the doctrines. Claim preclusion "blocks a second lawsuit if there is (1) an identity of the parties in the two suits; (2) a final judgment on the merits in the first; and (3) an identity of the causes of action." *Barr v. Bd. of Trs. of W. Ill. Univ.*, 796 F.3d 837, 840 (7th Cir. 2015). The requirements of claim splitting are not quite as stringent and do not require claim preclusion's second factor, finality of the judgment. *See Katz v. Gerardi*, 655 F.3d 1212, 1218 (10th Cir. 2011) ("While it is correct that a final judgment is necessary for traditional claim preclusion analysis, it is not required for the purposes of claim splitting."). As such, we need only

examine whether there is an identity of the parties and of the causes of action between the two lawsuits.

First, there is no dispute that an identity of parties exists in *Scholz I* and *Scholz II*. In both cases, plaintiff Scholz sued the same party as defendant: the United States. In *Scholz II*, Scholz added the Secretary of Health and Human Services as a named party. Nevertheless, the government argued, and Scholz has not challenged, that the Secretary was not a proper defendant under the FTCA and that the Secretary had not waived sovereign immunity. Scholz's claim against the Secretary is therefore waived. *See Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005). Even if the Secretary were a properly named party, the identity of parties between the two lawsuits would endure because the Secretary is an official of the United States government, the primary defendant in both cases. *See Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940) ("There is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.").

Second, and most in contention, is whether there is an identity between the causes of action in *Scholz I* and *Scholz II*. This element is satisfied if the "claims arise out of the same set of operative facts or the same transaction." *See Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011). That is to say, for claim splitting to apply, the legal theories for the claims in each case need not be the same provided "they are based on the same, or nearly the same, factual allegations." *See id.* (quoting *Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223, 226 (7th Cir. 1993)); *see also Nalco Co. v. Chen*,

843 F.3d 670, 674 (7th Cir. 2016) ("[The plaintiff] was obliged to raise all claims that stem from the same transaction or series of related transactions (what courts sometimes call the 'core of operative facts')." (citing Restatement (Second) of Judgments § 24 (1982) (rule against claim splitting))).

We now consider the *Scholz II* Counts I, II, III, and V (claims rooted in mental health treatment) and Counts IV, V, and VI (claims rooted in alleged misconduct arising throughout the course of the *Scholz I* litigation) in turn.

### a.   Mental Health Treatment Claims

Here, the lawsuits in *Scholz I* and *Scholz II* rest on essentially the same facts, so it was not an abuse of discretion for the district court to dismiss *Scholz II* on claim-splitting grounds. The complaints in each lawsuit begin almost identically. The *Scholz I* complaint brought a suit under the FTCA for "negligence and professional malpractice in connection with medical care provided to Plaintiff Scholz by the Department of Veterans Affairs at the Tomah [VAMC], the Zablocki [VAMC], and outpatient programs." The *Scholz II* amended complaint similarly brought a suit under the FTCA for "negligence and professional malpractice in connection with medical care provided to Plaintiff Scholz by the Department of Veterans Affairs."

More precisely, Counts I (medical negligence), II (pharmacy and oversight negligence), III (negligent failure to obtain informed consent), and V (negligent hiring, training, supervision, and retention) in *Scholz II* all implicate defendant's conduct post-2011. Her failure to secure relief for those alleged wrongs in *Scholz I*—whether for failure to comply with procedural requirements or for lack of merit—does not entitle

her to "take another bite at the apple." *See Bell*, 827 F.3d at 707. Scholz "was obliged to," but did not, "raise all claims that stem from the same transaction or series of related transactions" in *Scholz I. See Nalco*, 843 F.3d at 674. Her attempt to now bring claims resting on the same conduct in *Scholz II* is "a quintessential example of claim splitting in duplicative lawsuits, a litigation tactic that res judicata doctrine is meant to prevent." *Palka*, 662 F.3d at 437. We hold claim splitting was thus appropriate.

Scholz tries to argue there is "not a gap but a chasm" between *Scholz I* and *Scholz II* by characterizing the lawsuits as addressing different conduct at different times. She argues that *Scholz I* claims concerned the "botched breast surgery treatment at the Zablocki VA[MC] in 2012" which required four corrective surgeries and which Scholz alleged "was improper given Scholz's physical and mental afflictions following her 2011 mental health treatment at the Tomah VA[MC]." By contrast, Scholz argues, Counts I, II, III, and V in *Scholz II* concern the alleged "negligent outpatient mental health treatment after Scholz's discharge from the Tomah VA[MC]"—treatment that "was rendered by different VA employees at the Appleton, Green Bay, and Cleveland VA clinics from 2011 through 2018," and therefore not from the Tomah VAMC or Zablocki VAMC.

Scholz's creative attempt to bifurcate the basis of her claims in each lawsuit is belied by her repeated positions in *Scholz I*. The *Scholz I* complaint was not temporally limited to defendant's conduct in 2011 and 2012, and so did not exclude the allegedly negligent mental health treatment between 2011 and 2018 that *Scholz II* highlighted. Indeed, in stating her *Scholz I* claims for negligence, she broadly asserted that

defendant "negligently supervis[ed] and retain[ed] incompetent, inexperienced, unqualified and/or inadequately trained or supervised operators, administrators, employees, agents and staff and fail[ed] to take timely corrective action," and also "negligently fail[ed] to ensure that patient treatment records and deficiencies in care were timely communicated to all VAMC health care providers and to the Plaintiff." None of these claims were temporally limited to defendant's conduct in 2011–2012 or limited to the conduct by Tomah VAMC and Zablocki VAMC.

That the *Scholz I* claims turned on defendant's conduct extending until as late as 2018 can be further gleaned from the litigating positions that Scholz took at the summary-judgement stage in *Scholz I*. In responding to the government's motion for partial summary judgment in November 2018, Scholz invoked a "continuous treatment" theory based on Wisconsin law and maintained, based on her expert witnesses, that she "received continuous negligent mental health treatment during this entire period [from 2008 through early 2017] from VA healthcare providers." Referencing her SF-95 from *Scholz I*, Scholz asserted that "the negligent mental health treatment … occur[ed] 'on or about January 1, 2011 and continu[ed] to the present.'" She added that her experts "independently determined that plaintiff's negligent mental health treatment continued after her discharge from the Tomah VAMC program."

In her own motion for summary judgment, Scholz repeated these same arguments. She argued that her treatment after 2012 was a continuation of the negligence that began with the Tomah VAMC mental health treatment and Zablocki VAMC breast surgery. In particular, Scholz recounted that after the surgery she was "on 28 medications" and that she

continued to "suffer both physically and mentally in the following years." She noted how the four corrective surgeries occurred in 2012, 2013, and 2014 and left lingering "pain, breast deformities, scarring and lumps, and more mental health issues." Beyond the surgery complications, the problematic pharmacy practices, too, "did not stop with Plaintiff's discharge from the Tomah telehealth program in January 2012." Indeed, Scholz asserted that her treating psychiatrist Dr. Dy continued to (negligently) ignore over twenty-five pharmacy warnings when medicating Scholz until as late as 2018.

Likewise, Scholz's proffer of, and heavy reliance on, the declarations of Dr. Amsel and Dr. Johnson in *Scholz I* further undercut Scholz's argument that *Scholz I* was limited to 2011 conduct. Both experts outlined the case for why defendant acted negligently not only in its performance of Scholz's breast reduction surgery and the subsequent corrective surgeries but also in its continuing mental and physical health treatment of Scholz until as late as 2018. Dr. Amsel found "evidence of on-going continuous negligent mental health treatment practices affecting the Plaintiff's treatment during the years 2011 through the present at the Tomah VAMC, Zablocki VAMC, and VA outpatient clinics." Dr. Johnson similarly opined that "the pharmaceutical treatment rendered to the Plaintiff by the Department of Veteran Affairs commencing during Plaintiff's treatment at the Tomah VAMC and outpatient clinics during the years 2011 through 2017 … failed to meet the required standard of care of reasonable health care providers and was a cause of injury to" Scholz. Underscoring the identity of claims in the two cases, these declarations were then attached to the *Scholz II* administrative claims and *Scholz II* complaint.

In a final attempt to temporally limit the scope of *Scholz I* to conduct in 2011, Scholz argues the "controlling time" is the "date of the claims," rather than the "filing of the federal action on August 8, 2016." The dates of the underlying alleged harms are certainly relevant, but they are in no way dispositive. In fact, "[t]he crucial date is the date the complaint was filed." *Curtis*, 226 F.3d at 139. After that crucial date, a plaintiff "has no continuing obligation to file amendments to the complaint to stay abreast of subsequent events," and "may simply bring a later suit on those later-arising claims." *Id.* Here, Scholz filed her *Scholz I* complaint in 2016, when the bulk of the allegedly negligent treatment had already occurred. Thus, Scholz's filing timeline obligated her to include those claims at play on this "crucial date."

The *Scholz I* litigation reveals that Scholz and her experts consistently aimed the *Scholz I* claims at the government's alleged negligent conduct that extended into 2018. Accordingly, it is difficult to accept Scholz's contrary argument now that *Scholz I* had nothing to do with defendant's conduct between 2011 and 2018.

Beyond temporal arguments, Scholz tries to pin the course of litigation on administrative exhaustion requirements. Scholz argues, as she unsuccessfully argued to the district court, that she had to bring new administrative claims prior to *Scholz II* in order to seek recovery for the 2011 to 2018 conduct, and that limitation prevented her from bringing those claims in *Scholz I*. *See McNeil v. United States*, 508 U.S. 106, 113 (1993) ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."); 28 U.S.C. § 2675 (same). In other words, she contends

that she should not be barred now from bringing claims that she could not have brought in *Scholz I*.

We rejected a similar argument in the different context of § 1983 and Title VII claims in *Palka v. City of Chicago*, 662 F.3d 428 (7th Cir. 2011). In *Palka*, the plaintiffs sued under § 1983, then brought a subsequent lawsuit under Title VII, which was dismissed on claim-splitting grounds. *Id.* at 430, 437–38. On appeal, the plaintiffs argued that "it was impossible for them to preserve their Title VII claims because they were waiting for their right-to-sue letters from the EEOC." *Id.* at 438. We rejected the plaintiffs' argument because "a litigant in this position has [several] options to preserve his claim," including seeking a stay of the first suit until he receives the right-to-sue letter. *Id.* In *Palka*, res judicata barred the Title VII suit because the plaintiffs "availed themselves of none of these options." *Id.*

So too here. As the district court in *Scholz II* noted, Scholz had "a variety of options in navigating this issue, including asking that the administrative agency expedite the process, that the district court stay the first case pending the administrative process, or that the defendant agree to split a claim into two or more suits." Scholz "availed [herself] of none of these options," and so her argument about administrative remedies is unconvincing. *See Palka*, 662 F.3d at 438; *see also Barr*, 796 F.3d at 840 ("[T]he requirement to exhaust administrative remedies is no excuse for claim-splitting in [the employment-discrimination] context.").

### b. Claims Arising from Litigation

As a point worth discussing separately, Count IV (negligent failure to maintain and release accurate and complete

medical records), part of Count V (negligent failure to hire, train, supervise, and retain employees to ensure compliance with record disclosure obligations), and Count VI (VA misrepresentation)—those claims implicating alleged wrongdoing arising during the course of the *Scholz I* litigation—fare no better in undercutting the district court's claim splitting analysis.

With respect to Counts IV and V, the *Scholz I* district court already grappled with alleged discovery violations over the course of the extensive proceedings.[4] Illustrating this claim's duplicity, Scholz's October 26, 2020, motion for sanctions—filed during the *Scholz I* lawsuit—goes so far as to reference and incorporate discovery failure arguments advanced in *Scholz II*. The district court denied Scholz's motion for sanctions. Regardless, these *Scholz I* discovery issues cannot now form the basis of a separate lawsuit.

Furthermore, turning to Count VI, Scholz's surprise that *Scholz I*'s mental health treatment claims were deemed untimely is unpersuasive. By Scholz's formulation, "[t]he gravamen of Count VI is simple—the [government] failed to warn Scholz of changes in their administrative claims procedures

---

[4] Attacking defendant's alleged discovery misconduct in *Scholz I* under yet another theory, Scholz argues that defendant should not have been entitled to their claim-splitting defense because they had "unclean hands" for allegedly failing to provide Scholz with her requested outpatient pharmacy records until just two days before the discovery deadline in *Scholz I*, which prevented Scholz from effectively litigating those issues in *Scholz I*. As the district court in *Scholz II* made clear, however, Scholz "offer[ed] no evidence that Defendants have engaged in any misconduct," and has not made any such showing on appeal either. Even if she had, the district court correctly stated that the appropriate remedy would have been sanctions in *Scholz I*, not a new lawsuit.

that included adopting Wisconsin statute of limitations that conflicted with the federal statute of limitations and VA claims procedures." But the administrative denials did include specific warnings that state law may impact the timeliness of FTCA claims, disclaimers present in *Scholz I* and subsequently incorporated by Scholz into the *Scholz II* administrative complaint. *See Wenke v. Gehl Co.*, 682 N.W.2d 405, 425-26 (Wis. 2004) ("[M]ost jurisdictions recognize the running of a statute of limitation as being procedural …, while some others, including Wisconsin, treat the running of a statute of limitation as substantive."). Beyond these warnings, the district court also indicated that Scholz was on-notice that her claim might be time-barred more than a year before the case was dismissed. At summary judgment, Scholz had the opportunity to raise all issues relevant to timeliness, including equitable arguments relating to the alleged misrepresentations—an opportunity she did not take.

We presently find no reason to disagree with the district court's determination that Counts IV, V, and VI were reasonably wrapped into the same identity of the causes of action covering the broad set of interactions between Scholz and the VA. *See Brzostowski v. Laidlaw Waste Sys., Inc.*, 49 F.3d 337, 338-39 (7th Cir. 1995) (finding identity of causes of action when "claims … clearly arise out of the same core of operative facts and are based on the same factual allegations," even when "the legal elements of each claim may be different").

### III. Conclusion

As the district court put it, Scholz's theory amounts to "arbitrarily splitting the treatment timeline" because "[p]laintiff, in both suits, makes mention of her treatment for mental health issues, her bilateral breast reduction surgery, the

unsafe prescribing of medications, and improper record handling." We need not dive any deeper to hold the district court did not abuse its discretion when it found that "[b]oth suits arise out of Plaintiff's treatment at various VA locations from 2011 and 2018, and both suits make mention of the same alleged incidents."

For all these reasons, we reject Scholz's arguments to avoid claim splitting. Without reaching the other grounds for affirmance presented by the government, we AFFIRM the district court's dismissal.